IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2010 APR 23  AM 9: 09

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
                    DEPUTY

UNITED STATES OF AMERICA,

           Plaintiff,           Case No.

v.

| 1. | Pedro FUENTEZ | A-10-M-328 |
| 2. | Jose REYNALDO-CRUZ | A-10-M-324 |
| 3. | Jose GUADALUPE-VASQUEZ | A-10-M-323 |
| 4. | Oscar EDGARDO-GUILLEN | A-10-M-331 |
| 5. | Emmanuel NAVA-BENITEZ | A-10-M-330 |
| 6. | Irma MAJANO-ORELLANA | A-10-M-326 |
| 7. | Walter ROSALES | A-10-M-332 |
| 8. | Aurelio MATUTE-GUILLEN | A-10-M-327 |
| 9. | Jose GOROSIETA-CAMPUZANO | A-10-M-234 |
| 10. | Luis OSORIO-DEPAZ | A-10-M-329 |
| 11. | Celia Elizabeth AGUIRRE-FRIAS | A-10-M-325 |
| 12. | Javier CRUZ | A-10-M-333 |

           Defendants.

AFFIDAVIT OF JONATHAN M. TAPP
SPECIAL AGENT, FEDERAL BUREAU OF INVESTIGATION, AUSTIN, TEXAS,
IN SUPPORT OF APPLICATION FOR ARREST WARRANT

        Jonathan M. Tapp, (hereinafter referred to as "your affiant") being duly sworn,

states as follows:

        1.      Your affiant is Special Agent of the Federal Bureau of Investigation assigned to

the Austin Resident Agency in Austin, Texas.  Your affiant has been a Special Agent with the

Federal Bureau of Investigation for four years and has been assigned to the investigation of drug,

organized crime, and gang-related offenses during that period.

1

2.      Your affiant has been a sworn law enforcement officer for thirteen (13) years. Prior to being employed by the Federal Bureau of Investigation, your affiant was a Sergeant with the Kentucky State Police where he served for approximately eight and one half years. Your affiant has participated in the writing and execution of numerous search warrants leading to the seizure of controlled substances and other evidence.

3.      This affidavit is submitted in support of an application for arrest warrants for the following individuals: Pedro FUENTEZ, a.k.a. Miguel Angel Valdez, a.k.a. Sergio Romel Belmontes-Tejada, a.k.a. Sergio Belmontes-Romel, a.k.a. Sergio Belmontes, a.k.a. El Oso, a.k.a. El Tigre date of birth (DOB) May 23, 1980; Jose REYNALDO-CRUZ, DOB September 15, 1983; Jose GUADALUPE-VASQUEZ, a.k.a. Cuco, DOB October 11, 1975; Oscar EDGARDO-GUILLEN, DOB September 13, 1975; Emmanuel NAVA-BENITEZ, DOB December 25, 1985; Irma MAJANO-ORELLANA, DOB October 30, 1977; Walter ROSALES, a.k.a. Scott, DOB February 5, 1986; Aurelio MATUTE-GUILLEN, DOB June 7, 1969; Jose GOROSIETA-CAMPUZANO, DOB May 20, 1970; Luis OSORIO-DEPAZ, DOB January 8, 1964; Celia Elizabeth AGUIRRE-FRIAS, DOB September 15, 1983; and Javier CRUZ, DOB January 7, 1980. The grounds for the issuance of these arrest warrants are set forth in detail below.

4.      During the course of this investigation, your affiant has obtained information from federal, state and local law enforcement officers and agents, from confidential informants, from surveillance activities, from public and private custodians of records (e.g., for telephone toll and subscriber records, and for public utility records), and from other investigative techniques which are detailed below.

5.      Based upon the information set forth below, your affiant states that there is

2

probable cause to believe that, on or about dates within February 23, 2010, and April 21, 2010, within the State of Texas and the Western District of Texas, the defendants, Pedro FUENTEZ, Jose REYNALDO-CRUZ, Jose GUADALUPE-VASQUEZ, Oscar EDGARDO-GUILLEN, Emmanuel NAVA-BENITEZ, Irma MAJANO-ORELLANA, Walter ROSALES, Aurelio MATUTE-GUILLEN, Jose GOROSIETA-CAMPUZANO, Luis OSORIO-DEPAZ, Celia Elizabeth AGUIRRE-FRIAS, and Javier CRUZ, did knowingly and intentionally conspire to distribute and possess with the intent to distribute a mixture or substance containing a detectable amount of cocaine, a Schedule II Controlled Substance. All in violation of Title 21, United States Code Section 846, Conspiracy to Distribute and Possession with Intent to Distribute a Controlled Substance.

6.      Since approximately June 2009, your affiant has been involved in the joint investigation of FUENTEZ and other members of his organization involved in the distribution of cocaine obtained from sources of supply in the Republic of Mexico and Austin, Texas. This joint investigation is being conducted by investigators of the Federal Bureau of Investigation, Austin Police Department's (APD) Gang Suppression Conspiracy Units, the Drug Enforcement Administration (DEA), and the Texas Department of Public Safety, Narcotics Unit.

7.      Based on seizures, physical surveillance, confidential source information, and a District Court authorized Title III Interception of Wire Communications, this investigation has revealed that FUENTEZ is supplied with cocaine by sources of supply in the Republic of Mexico and Austin, Texas, including Jose GOROSIETA-CAMPUZANO. The cocaine is distributed in cities in the State of Texas.

3

CONFIDENTIAL SOURCE INFORMATION

Cooperating Defendant 1

8.      A cooperating defendant, hereinafter CD1, has provided a detailed history of

his/her knowledge of the MAJANO Drug Trafficking Organization (DTO).  CD1 is currently

incarcerated for a federal narcotics conviction and has a criminal history including a conviction

for distribution of cocaine.  CD1 provided the following information in order to receive

consideration for his/her federal cocaine conviction.  Information provided by CD1 has been

proven reliable and has been substantiated by independent sources.

9.      CD1 began trafficking cocaine as a subordinate to Joel MAJANO, a.k.a. "Chino."

Joel MAJANO is currently believed to be either in Honduras or Texas.  Alfredo MAJANO is

Joel's brother.  CD1 believed Alfredo had been arrested and received an 11-year sentence for

cocaine trafficking.  Your affiant confirmed that Alfredo BALVANERA-MEJIA, a.k.a. Alfredo

MAJANO, etc., was arrested by APD on March 23, 2001, for possession of cocaine but it is

unknown, based on Alfredo MAJANO's criminal history, as to what, if any, sentence Alfredo

MAJANO received.  However, based on CD1's information Alfredo MAJANO was distributing

cocaine in 2002 and 2003. CD1 also advised that a person known to him as "Nelson" was also

involved in the distribution of cocaine.  Investigators believe "Nelson" is Nelson

CASTELLANOS, a.k.a. Juan.  Nelson CASTELLANOS was arrested on October 28, 2004, and

received a 32-month sentence for distribution of cocaine.

10.     CD1 advised between 2002 and 2003, Joel MAJANO and Alfredo MAJANO

each distributed cocaine, but worked independently.  Joel MAJANO trafficked approximately

five to ten kilograms of cocaine per month.  After 2003, Joel and Alfredo MAJANO began to

work together and distributed approximately 50 to 60 kilograms of cocaine per week. Alfredo and Joel initially provided CD1 two and one half to three kilograms of cocaine per week for resale.

11.     CD1 played soccer with a person known to him as "El Tigre," a Honduran male approximately 27 to 28 years of age who also sold cocaine. El Tigre was also called "Oso." Investigators believe Tigre and Oso are aliases for Pedro FUENTEZ and have been utilized by FUENTEZ to other confidential sources and cooperating defendants as explained in more detail herein. El Tigre purchased approximately two to three kilograms of cocaine every four days, or seven to eight kilograms of cocaine per week from CD1 for three months ending April 2008.

Cooperating Defendant 3

12.     On July 30, 2009, your affiant and Detective DuBoise interviewed a cooperating defendant (hereinafter referred to as "CD3"). CD3 is cooperating with investigators in order to receive favorable consideration on a pending criminal prosecution. CD3 has been cooperating with investigators since July 2009 and CD3's information has been corroborated through independent sources. CD3 has always provided credible and reliable information.

13.     MACHACA operated a small, grey, four-door car and worked for CASTELLANOS distributing cocaine. CD3 ordered cocaine by calling MACHACA on his cellular telephone, (512) 406-4791, then MACHACA would bring the cocaine to CD3. CASTELLANOS did not know CD3 was purchasing cocaine from MACHACA. CD3 purchased one quarter ounce of cocaine from MACHACA on Sunday, July 26, 2009 pursuant to a controlled delivery observed by law enforcement officers.

14.     CD3 identified several members of the MAJANO DTO by photograph, including

Alejandro MAJANO, a.k.a. Alejandro Castillo GONZALEZ, a.k.a. "Tacho," DOB August 11, 1985; Joel Oregano MAJANO, DOB September 26, 1976; Alfredo MAJANO, DOB August 2, 1974; Irma Elizabeth MAJANO, a.k.a. Licha, a.k.a. Alicia, DOB October 31, 1977; Nelson Lomeli CASTELLANOS, a.k.a. Juan Ramon, DOB January 8, 1973; and IGUANA (in a photograph taken by APD on April 28, 2009).

15.     CD3 identified El Oso as Miguel Angel VALDEZ,[1] DOB May 25, 1981 from a photograph posted on ROSALES' "HI5" social networking site (investigators printed out photographs from this site but were unable to locate the actual site later on, leading to the belief that it possibly was removed). CD3 advised FUENTEZ's cellular telephone number was (512) 203-0340. Investigators observed this number in CD3's telephone. CD3 has known FUENTEZ for approximately seven years. FUENTEZ owns a food trailer, or taqueria, on Oltorf Street in Austin, Texas called, "Comida de Progreso," or something similar. Investigators confirmed the existence of this business. FUENTEZ's wife is Neli MARTINEZ. MARTINEZ's sons are Alsidas MARTINEZ and Carlos MARTINEZ and CD3 related that both sons work for FUENTEZ distributing cocaine. FUENTEZ has many vehicles, one grey Toyota Tundra pickup truck, and one white Honda Accord. Investigators have confirmed FUENTEZ driving a Toyota Tundra on multiple occasions. CD3 advised Detective DuBoise that FUENTEZ had been arrested for Driving While Intoxicated (DWI) in 2007 and was subsequently deported. Your affiant has found an arrest of FUENTEZ for DWI on June 30, 2006, in Austin, Texas. CD3 stated

---

[1]VALDEZ was later identified as an alias for FUENTEZ based on multiple identifications listed in more detail herein. CD3 possibly informed FUENTEZ of law enforcement interest in FUENTEZ. Therefore, CD3 was not provided additional information to corroborate FUENTEZ's identity, for fear of CD3's continued disclosure.

that FUENTEZ was deported following his detention at the end of October 2008 although he was deported to Mexico rather than Honduras, having falsely stated Mexico was his native country and, while in Mexico, he sought and found a connection with Los Zetas. Your affiant has confirmed that FUENTEZ was sentenced for Illegal Entry into the United States on January 9, 2008, by a United States Magistrate Judge in Del Rio, Texas. Your affiant cannot confirm FUENTEZ's deportation to Mexico rather than to Honduras. CD3 heard that FUENTEZ received 30 to 40 kilograms of cocaine from Los Zetas.

16.     CD3 identified a photograph of Areli Irias CASTAING, DOB January 21, 1964, as LITA. CASTELLANOS works for CASTAING. CD3 stated that FUENTEZ and CASTAING are the biggest cocaine distributors in Austin, Texas and that CASTAING has sources of cocaine supply in Mexico and Houston, Texas.

Confidential Source 1

17.     On November 30, 2009, your affiant interviewed Confidential Source 1 (hereinafter CS1). CS1 has proven to be reliable and credible in the past and his/her information has been corroborated by law enforcement actions. CS1 is receiving payment in exchange for his/her cooperation. CS1 advised that CS1 had been in contact with FUENTEZ on telephone numbers (512) 848-6896, (512) 698-6492, and (512) 300-5642, during the past several days. Your affiant confirmed the contacts on all three telephones by checking pen register data and call detail records. CS1 also advised FUENTEZ stated he was currently living in Pflugerville, Texas, at an unspecified location. CS1 observed FUENTEZ drive to an apartment complex located at Bluff Springs and William Cannon Boulevard in Austin, Texas, on November 27, 2009. FUENTEZ advised CS1 that FUENTEZ's brother, Elvis LNU, works for FUENTEZ and uses

7

telephone number (512) 552-6052.

18.    On December 4, 2009, at approximately 5:42 p.m., CS1 made a consensually monitored and recorded call to FUENTEZ at (512) 300-5642. During the call, FUENTEZ spoke with a third party on another telephone. According to call detail records, FUENTEZ received an incoming call on telephone number (512) 848-6896, at approximately 5:43 p.m., which lasted approximately seven minutes, from telephone number 011-504-97898648, believed to be a Honduran telephone number. Your affiant believes this call from Honduras occurred during the recorded call. This call was conducted in Spanish and translated to English.

19.    During the overheard third party call, FUENTEZ advised a third party (Carlos LNU) that all the cars were carrying the stuff in the front in the inside of the doors ("la puerta") and in the engine as well up against the backboard. FUENTEZ said he was stopped in Elgin, Texas. FUENTEZ said that he went to go buy a part and had to give the number, serial, and pin number. FUENTEZ said that "730" is the serial number, but he needed the pin number and the year. FUENTEZ said that he would go tomorrow afternoon and then told Carlos LNU to offer the "Tundra" and that the "BMW" was available. FUENTEZ asked if Carlos LNU was working because he had a buddy that needed some over there. He added that the buddy from San Pedro wants to know if there is some stuff. FUENTEZ said "two or three" and that his buddy wanted to start over there with some people. FUENTEZ said he was going to call to his buddy tonight. FUENTEZ then asked at how much is it going for. FUENTEZ asked if at "eight." FUENTEZ asked for Carlos LNU's number. FUENTEZ repeated back the following number: "96307656." FUENTEZ then returned to the conversation with CS1 and advised CS1, in coded language, that he had cocaine for sale if CS1 needed it. FUENTEZ advised CS1 he would sell 2.5 ounces of

8

cocaine for $2,000.00.

20.     Based on your affiant's training and experience, and a review of other recorded calls during this investigation, your affiant believes FUENTEZ was speaking about an individual from San Pedro Sula, Honduras, which is reported herein to be his place of origin. Additionally, your affiant believes FUENTEZ discussed hidden compartments in vehicles in which narcotics is typically stored. Then, FUENTEZ and Carlos LNU discussed another individual's narcotics business and Carlos LNU's assisting him.

21.     Later in December 2009, CS1 met with FUENTEZ. FUENTEZ advised CS1 he was purchasing cocaine from La Familia in Michoacan, Mexico. FUENTEZ advised he is now going by the nickname, "El Tigre," instead of "El Oso." FUENTEZ advised CS1 that Los Zetas want FUENTEZ to purchase cocaine from them; however, he is happy working with La Familia. FUENTEZ usually works during the day and ends at approximately 9:00 p.m. FUENTEZ advised he maintained five offices in Austin, Texas which cost him $7,000.00, however, he was considering cutting to two or three offices to save money. Additionally, FUENTEZ said he was planning on opening another office in a different city. FUENTEZ has a cousin in New York. FUENTEZ advised CS1 he was upset because of having to pay all the rent. FUENTEZ advised that his cousin in New York has clients and problems like FUENTEZ. FUENTEZ advised CS1 he likes to cook cocaine into crack and to cut cocaine into more kilograms. FUENTEZ advised that he is very careful and will not get caught by law enforcement. FUENTEZ advised that he has a MySpace page under "sergioaustintexas." Investigators were able to locate this web page at http://www.myspace.com/426840932, however, this page is listed as private. Your affiant observed a photo on this page which appeared to be FUENTEZ. The site said he was 27 years

old from Austin, Texas.

22.    On December 17, 2009, at approximately 9:21 p.m., Detective DuBoise and

Detective Shelton Eubanks observed CS1 make a consensually monitored and recorded call to

FUENTEZ at telephone number (512) 698-6492.  Detective DuBoise was in a position to observe

the digits dialed and monitor the call.  Your affiant confirmed the call by reviewing pen register

data.  During the call, which was conducted in Spanish, FUENTEZ agreed to sell CS1

approximately 2.5 ounces of cocaine for $2,000.00.  The recording is of low quality, FUENTEZ

advised, "I'm doing an errand before I go over there."  FUENTEZ agreed to deliver the cocaine

the following day, December 18, 2009.

23.    On December 18, 2009, Detective Rogers and Detective DuBoise met with CS1 in

order to conduct a controlled narcotics purchase from FUENTEZ.  Detective DuBoise conducted

a consensual search of CS1's vehicle and located no contraband.  Detective DuBoise was present

with CS1 as CS1 made a consensually recorded and monitored call to FUENTEZ, at telephone

number (512) 698-6492.  This call occurred on December 18, 2009, at approximately 11:53 a.m.

During the call, FUENTEZ agreed to deliver cocaine to CS1.   Detective DuBoise then provided

CS1 with $2,000.00 in prerecorded funds.  CS1 placed the money in a predetermined location for

FUENTEZ to retrieve and deposit the cocaine.  At approximately 12:55 p.m., Detective Rogers

observed a gray BMW arrive at the meet location.  The vehicle was occupied by multiple

Hispanic males.  The front seat passenger exited the BMW and went to the predetermined

location alone.  The unidentified Hispanic male appeared to exchange the cocaine for the money,

then got into the BMW, which left the scene.  Detective Rogers only recognized the Hispanic

male who delivered the narcotics as someone he had seen in the presence of FUENTEZ and

ROSALES on previous physical surveillances.  Detective Rogers then went to the predetermined location and recovered a vacuum-sealed package that contained a white substance that he recognized as cocaine. Detective Rogers later weighed and tested the suspected cocaine, which tested presumptively positive for cocaine and weighed approximately 133.4 grams with packaging. Investigators followed the BMW from the deal.  The BMW traveled to Stinson Auto Sales, at the corner of Bluebonnet and North Lamar Boulevard in Austin, Texas.

24.     On January 6, 2010, investigators met with CS1, who advised that FUENTEZ had begun using an additional cellular telephone, (512) 552-6052.  CS1 informed investigators the phone bearing this number had previously belonged to FUENTEZ' brother, Elvis LNU. However, FUENTEZ was now using (512) 552-6052, to conduct narcotics transactions.   As mentioned herein, CS1 advised in November and December 2009, that Elvis LNU was FUENTEZ' brother utilizing telephone number (512) 552-6052.

25.     On January 12, 2010, Detective DuBoise and your affiant met with CS1, who advised that FUENTEZ had obtained a new telephone number, (512) 633-4939.  In the presence of your affiant, who was able to observe the incoming and outgoing digits on CS1's cellular telephone, CS1 made a consensually recorded and monitored call to FUENTEZ at telephone number (512) 633-4939.  During this call, which was conducted in Spanish, CS1 spoke to FUENTEZ. The content of this call was personal in nature and is not included herein but illustrates CS1's contact and familiarity with FUENTEZ.

26.     Additionally, CS1 informed your affiant that FUENTEZ advised he keeps phones for one month, then discards them or puts them away to use later.  FUENTEZ also advised CS1 he takes phones previously used by acquaintances and utilizes them himself in order to further

11

insulate him from law enforcement interception.  FUENTEZ.  FUENTEZ advised CS1 he had

obtained yet another new phone in addition to (512) 633-4939, although FUENTEZ did not

provide this number. On January 6, 2010, investigators met with CS1, who advised that

FUENTEZ had begun using an additional cellular telephone, (512) 552-6052.  CS1 informed

investigators the phone bearing this number had previously belonged to FUENTEZ' brother,

Elvis LNU.  However, FUENTEZ was now using (512) 552-6052, to conduct narcotics

transactions.  As mentioned herein, CS1 advised in November and December 2009, that Elvis

LNU was FUENTEZ' brother utilizing telephone number (512) 552-6052.

27.     On February 3, 2010, CS1 advised that Pedro FUENTEZ, provided two of his

new cellular telephone numbers to CS1 ((512) 739-9886 (Target Telephone 2) and (512) 748-

4085 (Target Telephone 3).  CS1 advised these numbers are FUENTEZ' "dope phones."  CS1

further advised that FUENTEZ traveled to Chicago, Illinois on January 29, 2010, and returned on

February 3, 2010.  FUENTEZ traveled to Chicago to set up additional offices for his drug

business.  CS1 advised that  FUENTEZ often meets his clients at El Zunzal restaurant, 642

Calles Street, Austin, Texas.  The owner of El Zunzal closes the business for FUENTEZ, so that

FUENTEZ and his associates can have privacy.  Three weeks ago, Evan LNU, Areli

CASTAING's nephew, met FUENTEZ at El Zunzal.  During this time, El Zunzal was closed for

FUENTEZ by the owner.  CS1 wired $9,000.00 to Honduras through Western Union in two

transfers ($5,000.00 and $4,000.00), on behalf of ROSALES.  CS1 did not recall the name of the

recipient.  Your affiant has caused a subpoena to be issued requesting these receipts.  ROSALES

advised CS1 he distributes cocaine for FUENTEZ, but has acquired an additional source of

supply.

28.     On February 14, 2010, CS1 advised that an individual named "El Cabo," works for Pedro FUENTEZ distributing cocaine, and has a telephone number of (512) 844-7911.  Your affiant has confirmed contacts between Target Telephone 4 and telephone number (512) 844-7911, a.k.a. El Cabo.  CS1 advised that FUENTEZ also communicates by text messaging. Walter ROSALES' current telephone number is (512) 665-6929 (Target Telephone 1).  Per intercepted conversations on Target Telephone 1, ROSALES is believed to be the user of Target Telephone 1.  ROSALES also communicates by text messaging.  Investigators have established ROSALES' text messaging to and from Target Telephone 1 pursuant to the aforementioned order.  FUENTEZ recently bought a .38 super pistol and needed ammunition, although he could not purchase it because he was not in the United States legally.  FUENTEZ paid $2,000.00 for the pistol.

29.     On February 17, 2010, CS1 made two consensually recorded and monitored calls to Pedro FUENTEZ at telephone number (512) 739-9886 (Target Telephone 2).  However, FUENTEZ cannot be heard in the recordings due to the poor quality of the recording.  Detective DuBoise was present during the recordings and confirmed CS1's calling FUENTEZ at Target Telephone 2.  Furthermore, your affiant has confirmed these calls through pen register and call detail information.  CS1 advised that FUENTEZ' workers sleep at an apartment off of I35 south, possibly the Stone Creek apartments.  Jose Reynaldo CRUZ, a.k.a. Rojo, told CS1 this, but said that its too small and that they are moving.  CRUZ said that he stays there with Alex and Aurelio. FUENTEZ only has one office left and complained about profit and not liking the high rent he was paying.  CS1 stated that they refer to the Office as" La Cuerba."  CS1 believed it to be close to Bluff Springs and William Cannon.  FUENTEZ gets most of his business calls on the 740

13

number. CS1 said that FUENTEZ gets the calls, and then calls the workers to make the

deliveries. On Monday, February 15, 2010, FUENTEZ told a customer that he was out, and that

they would have to wait a little while. FUENTEZ was waiting on it to come in. On February 16,

2010, FUENTEZ told a customer that he would have it tomorrow morning.

    30.    On February 22, 2010, CS1 advised that Pedro FUENTEZ, a.k.a. El Oso, a.k.a.

Sergio, had a new telephone number to conduct business, which was (512) 748-8757 (Target

Telephone 4). FUENTEZ advised CS1 that he has the good stuff now and he was still using the

other two telephone numbers. FUENTEZ received a call from Mexico on February 21, 2010, on

telephone number (512) 739-9886, at approximately 7:30 p.m. or 8:00 p.m. Your affiant has

confirmed, through pen register and call detail information, that telephone number

52-482-36660095, called telephone number (512) 739-9886 (Target Telephone 2) at

approximately 19:52 hours on February 21, 2010. FUENTEZ did not answer the telephone;

however, advised CHS that it was "Mexico" calling. Your affiant believes this could be a source

of cocaine supply for FUENTEZ. CS1 has seen Alex LNU and CRUZ, a.k.a. Rojo, going to the

apartment complex. They were driving a white Nissan Sentra. Walter ROSALES advised CS1

he has been living at Slaughter Lane.

    31.    On February 23, 2010, CS1 made a consensually recorded and monitored call to

Pedro FUENTEZ, a.k.a. El Oso, at telephone number (512) 748-8757 (Target Telephone 4).

Your affiant confirmed this call through call detail records. This call was made in the presence

of Detective Otho DuBoise, Austin Police Department. During the call, which was conducted in

Spanish, FUENTEZ asked, "Has Vacuvo called you?" FUENTEZ further advised that Vacuvo

owed FUENTEZ, "about $300.00." CS1 represented this debt was from a previous cocaine

purchase.  Then FUENTEZ asked if CS1 needed additional cocaine, "Are you going to need

something?"  Following the consensually recorded call, CS1 met FUENTEZ in Austin, Texas on

the same day and advised that FUENTEZ said they don't have the same car lot anymore.  They

have moved to a place on 183 South.   FUENTEZ complained that business was slow.

      32.    Information provided by CS1 has been corroborated by independent sources, law

enforcement data bases, pen registers, physical surveillance conducted by investigators and a

District Court authorized Title III Interception of Wire Communications..  In March 2010, CS1

was overheard in communications with FUENTEZ, wherein your affiant believes CS1 requested

approximately one (1) ounce of cocaine from FUENTEZ.  Investigators then observed

FUENTEZ meet with CS1 in Austin, Texas.  CS1 contacted Detective DuBoise following the

meeting and advised Detective DuBoise of the location of the meeting and the parties present,

but did not mention CS1's role in the exchange of cocaine.  Despite CS1's earlier information

which had been corroborated on a number of occasions, due to CS1's suspected activity,

investigators are not in a position to further direct CS1.

Confidential Source 2

      33.    In September 2009, Detective DuBoise contacted a confidential informant

regarding this investigation (hereinafter referred to as "CS2").  CS2 is cooperating with law

enforcement for monetary gain.  CS2 is believed to be reliable and credible and has provided

investigators with accurate information.  Information provided by CS2 has been corroborated by

independent sources.

      34.    CS2 made controlled purchases and consensually recorded conversations between

himself/herself and ROSALES on October 13, 2009, October 15, 2009, and November 18, 2009.

Contributions made by CS2 were delineated in detail in the affidavit supporting order A-10-CR-096-LY, and are included herein by reference.  CS2, however, is not currently in a position to provide information to investigators.

Confidential Source 3

35.   In October 2009, your affiant was contacted by APD Detective Jesse Prado regarding this investigation.  Detective Prado had been informed by a confidential informant (hereinafter "CS3") regarding persons known to him/her as Pelon LNU and FUENTEZ, a.k.a. El Tigre.  Detective Prado has informed your affiant that CS3 has been providing information for approximately seven years and has never provided false or misleading information.  Detective Prado also informed your affiant that CS3 has consistently provided accurate information which has been corroborated by independent investigation.  CS3 is cooperating with investigators for monetary gain.  CS3 has been arrested for family violence and traffic violations.

36.   During the month of October 2009, Detective Prado met with CS3 in order to meet a potential source of cocaine supply.  During that subsequent meeting, CS3 met Pelon LNU, who informed CS3 that he could get CS3 any amount of cocaine CS3 needed.  CS3 described Pelon LNU as a Honduran male that lived in an apartment near Riverside and Arena in Austin, Texas.  Detective Prado and other APD investigators conducted physical surveillance in the area of Riverside and Arena and observed a vehicle arrive with four male subjects.  One subject introduced himself to CS3 as "Tigre," believed to be FUENTEZ, and provided telephone number (512) 848-6896 (see pen register section below), as his contact number and advised CS3 to call this number if CS3 wanted cocaine.  CS3 has identified photographs of FUENTEZ supplied by law enforcement.  CS3 knows him only as "Tigre" and could provide his full name.

37.  According to Detective Prado, on November 19, 2009, CS3 made a consensually recorded and monitored call to FUENTEZ at (512) 848-6896 to request the purchase of cocaine. Your affiant has confirmed that this call took place by reviewing pen register and call detail records.  During the call, FUENTEZ asked CS3 if CS3 meant four or five quantities of cocaine, "cuatro o cinco."  FUENTEZ advised CS3 that he could sell five ounces of cocaine for $500.00 per ounce, "cinco pesos."  CS3 asked FUENTEZ if he could sell "big boys" meaning five kilograms of cocaine, and FUENTEZ asked CS3 if he meant the "big boys" ("muchachos") that they would have to meet to discuss this further and it would be okay, "okay, esta bien."  There was no follow-on meeting regarding the purchase, however on February 16, 2010, CS3 made a consensually recorded and monitored call to FUENTEZ at (512) 748-4085 (Target Telephone 3) in which FUENTEZ acknowledged that he had kilogram amounts of cocaine for sale to which he again referred to them as "boys"(translated from Spanish).

38.  On February 16, 2010, CS3 advised your affiant that CS3 had been contacted by Pelon LNU who had provided telephonic contact with FUENTEZ.  On February 16, 2010, CS3, in the presence of Detective DuBoise and your affiant, who confirmed the call through call detail records, made a consensually recorded and monitored call to FUENTEZ at telephone number (512) 748-4085, (Target Telephone 3).  During the call, which was conducted in Spanish, CS3 and FUENTEZ discussed quantities of cocaine, "muchachitos."  CS3 advised your affiant this was coded language for kilogram quantities of cocaine.  FUENTEZ advised CS3 they could meet in person in "two hours."

Confidential Source 4

39.  In December 2009, Detective Prado was approached by another confidential

informant (hereinafter "CS4"). CS4 is cooperating with investigators because of CS4's desire to assist law enforcement. CS4 believes the target organization is comprised of dangerous individuals and should be investigated by law enforcement officials. Detective Prado has informed your affiant CS4 has provided credible and reliable information and has never provided false or misleading information. Your affiant found no criminal history associated with CS4. Investigators have lost communication with CS4 and have not been able to contact CS4 for additional information.

40.    According to Detective Prado, in November 2009, CS4 advised that Alex LNU, using telephone number (512) 367-3986, was in the business of selling cocaine. Alex LNU works for Walter LNU [ROSALES], who utilizes telephone number (512) 665-6743. Both Alex LNU and ROSALES are Honduran males. Alex LNU showed CS4 a distributable amount of cocaine. ROSALES has a brother, Pictuco, a.k.a. Jorge,[23] [believed to be FUENTEZ] who is in charge of the cocaine operation and claims to be part of the La Familia Cartel. FUENTEZ is usually accompanied by a male named Ramon LNU, who uses telephone number (512) 801-7914. Detective Prado further advised your affiant that CS4 is aware of Pedro LNU, using telephone number (512) 203-8307, is a third brother and claims to go to Laredo, Texas every 15 to 20 days to pick up large amounts of drugs. On December 15, 2009, CS4 identified previously mentioned photographs of FUENTEZ as Jorge LNU, and photographs of ROSALES as Walter LNU.

---

[2]CS4 later identified a photograph of FUENTEZ as Jorge to your affiant.

[3]APD Detective Rogers advised your affiant that, according to APD report 10-0070347 on January 7, 2010, telephone number (512) 698-6492, was used by an individual named Jorge Perez, a Honduran male. Your affiant believes Jorge Perez is an additional alias for FUENTEZ, per the APD report and the report by CS4.

## CONTROLLED PURCHASES

41.    On October 13, 2009; October 15, 2009; and November 18, 2009, APD

investigators conducted controlled purchases of cocaine from ROSALES utilizing CS2.  On

January 20, 2010, and March 8, 2010, APD investigators conducted controlled purchases of

cocaine from Walter ROSALES in Austin, Texas, utilizing an undercover officer (hereinafter

UC).  The substances obtained during these controlled purchases tested positive for the presence

of cocaine.

42.    On December 18, 2009, APD investigators conducted a controlled purchase of

cocaine from FUENTEZ, utilizing CS1, who provided credible and reliable information that was

corroborated by independent sources.  The substance obtained during this controlled purchase

tested positive for the presence of cocaine.

## TITLE III AUTHORIZATIONS

43.    On February 23, 2010, the Honorable Lee Yeakel, United States District Judge,

for the Western District of Texas, signed order number A-10-CR-096-LY, authorizing the

interception of wire and electronic communications over T-Mobile telephone number (512) 665-

6929 (hereinafter Target Telephone 1), which is a cellular telephone subscribed to by Xcot

Acerro, 2207 Wickeyshan 909, Austin, Texas, and believed to be in the possession of and

utilized by Walter ROSALES.  Interception began on February 23, 2010, for an initial 30-day

period.  Interception was discontinued on March 7, 2010, after the account for this phone became

deficient of funds.  The Order sought the interception of Pedro FUENTEZ, a.k.a. Miguel Angel

VALDEZ, a.k.a. Sergio Romel BELMONTES-TEJADA, a.k.a. Sergio BELMONTES-ROMEL,

a.k.a. Sergio BELMONTES, a.k.a. El Oso, a.k.a. El Tigre, and other members and/or associates

of the MAJANO DRUG TRAFFICKING ORGANIZATION (MAJANO DTO), including Pelon

LNU, Elvin MARTINEZ-MARTINEZ, Rachel AGUIRRE, Walter Alfonso ROSALES, Luis

Alberto MEJIA, Juan Carlos CARNALES, Celia E. AGUIRRE, Carlos DOMINGUEZ, Juan

Carlos FUNEZ-HERNANDEZ, Juan Carlos TAVIRA, Alex LNU, Raul Armando REYES, Hugo

Osvaldo PEDRAZA, Alma CHIHUAHUA, Joel Oregano MAJANO, Irma Elizabeth MAJANO,

Nelson Lomeli CASTELLANOS, FNU LNU, a.k.a. IGUANA, FNU LNU, a.k.a. MACHACA,

and Alejandro Castillo MAJANO, and others as yet unknown.  The affidavit filed in support

of that application is incorporated by reference into the instant affidavit.  During the

course of this interception, Pedro FUENTEZ, Jose REYNALDO-CRUZ, Walter ROSALES,

Aurelio MATUTE-GUILLEN, Celia Elizabeth AGUIRRE-FRIAS, and others were intercepted

on multiple occasions.  Many of these individuals were known under their aliases, or nicknames,

until apprehension on April 21, 2010.

    44.    On March 12, 2010, the Honorable Sam Sparks, United States District Judge, for

the Western District of Texas, signed order number A-10-CR-164-SS, authorizing the

interception of wire communications over T-Mobile telephone number (512) 739-9886

(hereinafter Target Telephone 2), which is a cellular telephone subscribed to by Rene Ramos,

1016 West Stassney Lane, Austin, Texas 78745, and believed to be in the possession of and

utilized by Pedro FUENTEZ; and the interception of wire communications over Sprint telephone

number (512) 748-4085 (hereinafter Target Telephone 3), which is a cellular telephone

subscribed to by Fabian Rosales; P.O. Box 54988, Irvine, California 92619, and believed to be in

the possession of and utilized by Pedro FUENTEZ; and the interception of wire communications

over Sprint telephone number (512) 748-8757 (hereinafter Target Telephone 4), which is a

cellular telephone subscribed to by Jorge Monte, P.O. Box 54988, Irvine, California 92619, and

believed to be in the possession of and utilized by Pedro FUENTEZ.  Interception began on

March 12, 2010, for an initial 30-day period and continues.  The Order sought the interception of

Pedro FUENTEZ, a.k.a. Miguel Angel VALDEZ, a.k.a. Sergio Romel BELMONTES-TEJADA,

a.k.a. Sergio BELMONTES-ROMEL, a.k.a. Sergio BELMONTES, a.k.a. El Oso, a.k.a. El Tigre,

and other members and/or associates of the MAJANO DRUG TRAFFICKING

ORGANIZATION (MAJANO DTO), including Pelon LNU, Elvin MARTINEZ-MARTINEZ,

Rachel AGUIRRE, Walter Alfonso ROSALES, Luis Alberto MEJIA, Juan Carlos CARNALES,

Celia E. AGUIRRE, Carlos DOMINGUEZ, Juan Carlos FUNEZ-HERNANDEZ, Juan Carlos

TAVIRA, Alex LNU, Raul Armando REYES, Hugo Osvaldo PEDRAZA, Alma CHIHUAHUA,

Joel Oregano MAJANO, Irma Elizabeth MAJANO, Nelson Lomeli CASTELLANOS, FNU

LNU, a.k.a. IGUANA, FNU LNU, a.k.a. MACHACA, and Alejandro Castillo MAJANO, Saul

DELAROSA, Rosa AMAYA, FNU LNU, a.k.a. El Cabo, Robucio LNU, Junior LNU, Ricardo

LNU, Jose Reynaldo CRUZ, Vacuvo LNU, and others as yet unknown.  The affidavit filed in

support of that application is incorporated by reference into the instant affidavit.

During the course of this interception, which expired on April 10, 2010, and was renewed

on April 12, 2010, Pedro FUENTEZ, Jose REYNALDO-CRUZ, Jose GUADALUPE-

VASQUEZ, Oscar EDGARDO-GUILLEN, Irma MAJANO-ORELLANA, Walter ROSALES,

Aurelio MATUTE-GUILLEN, Jose GOROSIETA-CAMPUZANO, Luis OSORIO-DEPAZ,

Celia Elizabeth AGUIRRE-FRIAS, and Javier CRUZ, and others were intercepted on multiple

occasions.  Many of these individuals were known under their aliases, or nicknames, until

apprehension on April 21, 2010.

21

45.    On April 12, 2010, the Honorable Sam Sparks, United States District Judge, for the Western District of Texas, signed order number A-10-CR-164-SS, authorizing the renewed interception of wire communications over Target Telephone 2, Target Telephone 3, Target Telephone 4, and the initial interception of wire communications over (512) 848-1908, (hereinafter Target Telephone 5), which is a cellular telephone subscribed to by Ruben Carbajal, 7602 Northview Ln, Austin, Texas, and believed to be in the possession of and utilized by Jose GOROSIETA-CAMPUZANO, for an initial 30-day period and continues. The Order sought the interception of Pedro FUENTEZ, a.k.a. Miguel Angel VALDEZ, a.k.a. Sergio Romel BELMONTES-TEJADA, a.k.a. Sergio BELMONTES-ROMEL, a.k.a. Sergio BELMONTES, a.k.a. El Oso, a.k.a. El Tigre, and other members and/or associates of the MAJANO DRUG TRAFFICKING ORGANIZATION (MAJANO DTO), including Pelon LNU, Elvin MARTINEZ-MARTINEZ, Rachel AGUIRRE, Walter Alfonso ROSALES, Luis Alberto MEJIA, Juan Carlos CARNALES, Celia E. AGUIRRE, Carlos DOMINGUEZ, Juan Carlos FUNEZ-HERNANDEZ, Juan Carlos TAVIRA, Alex LNU, Raul Armando REYES, Hugo Osvaldo PEDRAZA, Alma CHIHUAHUA, Joel Oregano MAJANO, Irma Elizabeth MAJANO, Nelson Lomeli CASTELLANOS, FNU LNU, a.k.a. IGUANA, FNU LNU, a.k.a. MACHACA, and Alejandro Castillo MAJANO, Saul DELAROSA, Rosa AMAYA, FNU LNU, a.k.a. El Cabo, Robucio LNU, Junior LNU, Ricardo LNU, Jose Reynaldo CRUZ, Vacuvo LNU, Haydy Yolany FUNEZ, Jose GOROSIETA-CAMPUZANO, Luis OSORIO-DEPAZ, Rene JAIMES, Uberaldo BENITEZ-REBOLLAR, Curso LNU, William LNU, and others as yet unknown. The affidavit filed in support of that application is incorporated by reference into the instant affidavit. During the course of this interception, Pedro FUENTEZ, Jose REYNALDO-

CRUZ, Jose GUADALUPE-VASQUEZ, Oscar EDGARDO-GUILLEN, Irma MAJANO-

ORELLANA, Walter ROSALES, Aurelio MATUTE-GUILLEN, Jose GOROSIETA-

CAMPUZANO, Luis OSORIO-DEPAZ, Celia Elizabeth AGUIRRE-FRIAS, and Javier CRUZ,

and others were intercepted on multiple occasions.  Many of these individuals were known under

their aliases, or nicknames, until apprehension on April 21, 2010.

FACTS AND CIRCUMSTANCES

46.     On February 24, 2010, at approximately 18:12 hours, call number 81 on Target

Telephone 1, ROSALES spoke with AGUIRRE-FRIAS at (512) 317-0951.  During the

conversation, which was conducted in Spanish, ROSALES asked if AGUIRRE-FRIAS had sold

that stuff yet so he could take her another one.  She said she hadn't and she still had about four.

She said she would check with ROSALES and let him know when she could get another one.

47.     Based on your affiant's training and experience in narcotics investigations and

with this criminal organization including controlled purchases of cocaine from ROSALES, your

affiant believes this conversation was a coded conversation between AGUIRRE-FRIAS and

ROSALES wherein ROSALES asked her if she needed another one.  Your affiant has observed

controlled purchases of multiple ounce quantities of cocaine from ROSALES and believes this

reference to "one" and AGUIRRE-FRIAS' reference to her having four, are ounce quantities of

cocaine.

48.     On February 24, 2010, at approximately 22:37 hours, call number 116 on Target

Telephone 1, ROSALES spoke with AGUIRRE-FRIAS at (512) 317-0951.  During the

conversation, which was conducted in Spanish, ROSALES asked if AGUIRRE-FRIAS if she had

sold the stuff yet.  AGUIRRE-FRIAS said she won't have the money until tomorrow.

23

49.   Based on your affiant's training and experience in narcotics investigations and with this criminal organization including controlled purchases of cocaine from ROSALES, your affiant believes this conversation was a coded conversation between AGUIRRE-FRIAS and ROSALES wherein ROSALES asked if AGUIRRE-FRIAS had the payment for the ounce of cocaine ROSALES had sold her on credit.  Your affiant is aware that many narcotics traffickers of ounce quantities sometimes provide cocaine on credit to trusted customers.  Furthermore, AGUIRRE-FRIAS responded that she hadn't received the payment yet, suggesting that she too had sold the cocaine on credit and was waiting on payment.

50.   On February 25, 2010, at approximately 05:23 hours, call number 119 on Target Telephone 1, ROSALES spoke with AGUIRRE-FRIAS at (512) 317-0951.  During the conversation, which was conducted in Spanish, AGUIRRE-FRIAS asked what ROSALES was doing.  He told her he was mixing "powder."  AGUIRRE-FRIAS said, "what?"  Then ROSALES replied again that he was "mixing some powder."  AGUIRRE-FRIAS then asked him when he would come to the gym and give her "that thing."  He said he would do it tomorrow morning.

51.   Based on your affiant's training and experience in narcotics investigations and with this criminal organization including controlled purchases of cocaine from ROSALES, your affiant believes this conversation was a coded conversation between AGUIRRE-FRIAS and ROSALES wherein ROSALES told AGUIRRE-FRIAS that he was diluting cocaine with a cutting agent, "mixing some powder."  Your affiant is aware cocaine traffickers often dilute cocaine with substances such as Mannitol or Vitamin B in order to increase the amount of cocaine they can sell and therefore their profits.

52.   On March 21, 2010, at approximately 14:18 hours, call number 814 on Target

24

Telephone 4, FUENTEZ made an outgoing call to Jose REYNALDO-CRUZ at (512) 435-9195. During the conversation, which was conducted in Spanish, REYNALDO-CRUZ told FUENTEZ that he had talked to Becky and she wanted something. REYNALDO-CRUZ told FUENTEZ he needed to send something to her. He said she wanted the "chiquito one," or small one.

53.     Based on your affiant's training and experience in narcotics investigations and with this criminal organization, your affiant believes this conversation was a coded conversation between FUENTEZ and REYNALDO-CRUZ, wherein REYNALDO-CRUZ requested an ounce of cocaine to purchase for a customer named Becky. During the conversation, REYNALDO-CRUZ referred to the customer's wanting a small one, "chiquito one." Based on your affiant's experience in narcotics investigations and this investigation, your affiant believes this was coded language for one ounce of cocaine.

54.     On March 26, 2010, at approximately 11:02 hours, call number 1070 on Target Telephone 4, FUENTEZ made an outgoing call to Jose REYNALDO-CRUZ at (512) 435-9195. During the conversation, which was conducted in Spanish, the two initially talked about a girl. Later in the conversation, FUENTEZ told REYANLDO-CRUZ he would be there in a while, but not to say anything to the guy, because he could not bring the "tortillas."

55.     Based on your affiant's training and experience in narcotics investigations and with this criminal organization, your affiant believes this conversation was a coded conversation between FUENTEZ and REYNALDO-CRUZ, wherein FUENTEZ advised REYNALDO-CRUZ, in coded language, not to reveal his coming to an unidentified suspected cocaine customer, because he could not bring the ounces of cocaine, "tortillas." Based on your affiant's experience in this investigation, your affiant believes FUENTEZ' mention of "tortillas" was

25

coded language for ounce quantities of cocaine.

56.     On March 30, 2010, at approximately 14:54 hours, call number 1498 on Target Telephone 4, FUENTEZ made an outgoing call to Jose REYNALDO-CRUZ at (512) 435-9195. During the conversation, which was conducted in Spanish, REYNALDO-CRUZ told FUENTEZ that he spoke to Victor and he wanted "tostones." FUENTEZ said he would send Alex.

57.     Based on your affiant's training and experience in narcotics investigations and with this criminal organization, your affiant believes this conversation was a coded conversation between FUENTEZ and REYNALDO-CRUZ, wherein REYNALDO-CRUZ advised FUENTEZ, in coded language, that he received an order from a customer who wanted "tostones." Based on controlled purchases, surveillance, and intercepted communications in this investigation, your affiant believes "tostones" was coded language for a small amount of cocaine. Detective DuBoise informed your affiant that CS1 advised him Victor was a cocaine addict. Your affiant believes he would only be able to afford a small, user amount of cocaine.

58.     On March 28, 2010, at approximately 18:38, call number 1293 on Target Telephone 4, FUENTEZ spoke with Irma MAJANO-ORELLANA at (512) 233-8265, and asked how many MAJANO-ORELLANA needed, because he only had a few left. MAJANO-ORELLANA told FUENTEZ that she wanted the same as last time. FUENTEZ asked if she was ready so he could send the guys over. MAJANO-ORELLANA asked if it was a whole. FUENTEZ said it was whole and he'd be there in forty-five minutes.

59.     Based on your affiant's training and experience in narcotics investigations and with this criminal organization, your affiant believes this conversation was a coded conversation between FUENTEZ and MAJANO-ORELLANA, wherein FUENTEZ asked MAJANO-

26

ORELLANA how many ounces of cocaine ["how many"] she needed. MAJANO-ORELLANA told FUENTEZ she wanted the same and FUENTEZ asked if she was ready. Based on your affiant's experience with interceptions on this investigation, your affiant believes FUENTEZ asked if MAJANO-ORELLANA had the funds to pay for FUENTEZ' cocaine. Then MAJANO-ORELLANA asked FUENTEZ if is was a "whole" and he responded it was. Again, based on this experience, your affiant believes MAJANO-ORELLANA requested one kilogram of cocaine, ["whole"] from FUENTEZ, rather than a quantity of ounces, ["how many"]. FUENTEZ said he would send his "guys," known by your affiant to be EDGARDO-GUILLEN and MATUTE-GUILLEN, based on surveillance and intercepted communications.

60.    On April 1, 2010, at approximately 13:46 hours, call number 1622 on Target Telephone 4, FUENTEZ made an outgoing call to Jose GUADALUPE-VASQUEZ at (512) 634-6294, UFMI 143*132188*25. During the conversation, which was conducted in Spanish, FUENTEZ spoke to GUADALUPE-VASQUEZ asked GUADALUPE-VASQUEZ to bring him four little boxes of that stuff. They then spoke about taking gold to an unidentified female and direct flights to Monterey, Mexico.

61.    Based on your affiant's training and experience in narcotics investigations and with this criminal organization, your affiant believes this conversation was a coded conversation between FUENTEZ and GUADALUPE-VASQUEZ, wherein FUENTEZ asked GUADALUPE-VASQUEZ to bring him a quantity of suspected cocaine, "four little boxes of that stuff." Based on intercepted communications indicating FUENTEZ deals in ounce and kilogram quantities of cocaine and subsequent confirmation of that believe through controlled purchases, seizures of kilograms of cocaine, and deposited trash indicating kilograms quantities of cocaine, your affiant

believes FUENTEZ asked GUADALUPE-VASQUEZ to supply him with four kilograms of cocaine.

62.     On April 2, 2010, at approximately 15:53 hours, call number 1748 on Target Telephone 4, FUENTEZ received an incoming call from MAJANO-ORELLANA at (512) 233-8265.  During the conversation, which was conducted in Spanish, MAJANO-ORELLANA asked FUENTEZ if he had any.  She advised she needed one quarter and asked if she could get it for six twenty-five, which she got before.  FUENTEZ said sixty-four because he was charged twenty-four.  Then he told her he could do sixty-three.

63.     Based on your affiant's training and experience in narcotics investigations and with this criminal organization, your affiant believes this conversation was a coded conversation between FUENTEZ and MAJANO-ORELLANA, wherein MAJANO-ORELLANA asked FUENTEZ to purchase one quarter kilogram of cocaine.  They then agreed on a price of $6,300, after FUENTEZ told MAJANO-ORELLANA he had paid $24,000 per kilogram of cocaine.  Your affiant is aware that FUENTEZ and MAJANO-ORELLANA traffic in cocaine based on prior arrests, controlled purchases, source reporting, and intercepted communications.  Your affiant is also aware, based on these same experiences, that these prices, $6,300 per 0.25 kilograms of cocaine and $24,000 per kilogram of cocaine, are consistent with the current price of cocaine in Austin, Texas.

64.     On April 3, 2010, at approximately 11:12 hours, call number 1870 on Target Telephone 4, FUENTEZ made an outgoing call to GOROSIETA-CAMPUZANO at Target Telephone 5.  During the call, which was conducted in Spanish, GOROSIETA-CAMPUZANO said he was lent "one thousand pesos" from a guy, but wanted "two thousand" and did not get it.

GOROSIETA-CAMPUZANO said he didn't know if FUENTEZ needed it.  GOROSIETA-CAMPUZANO advised FUENTEZ the "hombre" went over there and he will call to meet in one hour or one hour and one half.

65.     Based on your affiant's training and experience in narcotics investigations and with this criminal organization, your affiant believes this conversation was a coded conversation between GOROSIETA-CAMPUZANO regarding FUENTEZ' payment of the suspected cocaine just supplied.  Your affiant believes "one thousand pesos" referred to one thousand grams of cocaine, or one kilogram.  GOROSIETA-CAMPUZANO said he had expected to receive "two thousand," or two kilograms of cocaine.  Furthermore, GOROSIETA-CAMPUZANO advised FUENTEZ that he sent his "hombre," believed to be OSORIO-DEPAZ, based on subsequent calls and surveillance, to retrieve the suspected cocaine.

66.     On April 3, 2010, at approximately 11:14 hours, call number 1871 on Target Telephone 4, FUENTEZ made an outgoing call on Target Telephone 4 to Robucio LNU at (512) 483-4316.  During the call, which was conducted in Spanish, FUENTEZ advised that something just came in.

67.     Based on your affiant's training and experience in narcotics investigations and with this criminal organization, your affiant believes that, during this conversation, FUENTEZ advised Robucio LNU he had acquired cocaine, "something," for sale.  Your affiant believes FUENTEZ advised Robucio LNU that something had just come in, meaning one kilogram of cocaine just mentioned available by GOROSIETA-CAMPUZANO.

68.     On April 3, 2010, at approximately 12:44 hours, call number 1894 on Target Telephone 4, FUENTEZ received an incoming call from OSORIO-DEPAZ at (512) 247-8811.

During the call, which was conducted in Spanish, OSORIO-DEPAZ advised he is free and would be there in about "forty" minutes.

69.   On April 3, 2010, at approximately 13:20 hours, an individual who had left 12401 Copperfield driving a gray Nissan pickup bearing Texas license plates AJ08779 arrived at 8405 Winterhaven, Austin, Texas.  This Hispanic male exited the pickup, removed a Tide detergent box from the truck tool box and went into the residence.

70.   Based on your affiant's training and experience in narcotics investigations and with this criminal organization, and the accompanying surveillance, your affiant believes FUENTEZ purchased a quantity of cocaine from GOROSIETA-CAMPUZANO, delivered by OSORIO-DEPAZ, who carried it into the Winterhaven address in the Tide detergent box.

71.   On April 3, 2010, at approximately 13:04 hours, call number 1900 on Target Telephone 4, FUENTEZ made an outgoing call on Target Telephone 4 to Aurelio MATUTE-GUILLEN at (512) 704-3842.  During the call, which was conducted in Spanish, FUENTEZ asked MATUTE-GUILLEN where they were exactly.  MATUTE-GUILLEN advised they were on I35.  FUENTEZ told MATUTE-GUILLEN to head to the office and he would meet them there.

72.   Based on your affiant's training and experience in narcotics investigations and with this criminal organization, and the accompanying surveillance, your affiant believes FUENTEZ directed MATUTE-GUILLEN to meet him at 8405 Winterhaven, where investigators had just observed OSORIO-DEPAZ deliver suspected cocaine to FUENTEZ in order to assist in the repackaging and distribution of this cocaine.

73.   On April 3, 2010, at approximately 13:25 hours, call number 1901 on Target

Telephone 4, FUENTEZ received an incoming call from EDGARDO-GUILLEN at (512) 844-7911. During the call, which was conducted in Spanish, EDGARDO-GUILLEN said the "Senor" had arrived there and the work was going to be "weighed." FUENTEZ said he would be there soon.

74.     Based on your affiant's training and experience in narcotics investigations and with this criminal organization, and the accompanying surveillance, your affiant believes this conversation referred to EDGARDO-GUILLEN's meeting the "Senor" [OSORIO-DEPAZ who was observed by investigators] with the Tide detergent box believed to contain cocaine and they proceeded to weigh ["weighed"] the cocaine.

75.     On April 3, 2010, at approximately 15:13 hours, call number 1927 on Target Telephone 4, FUENTEZ received a call from Javier CRUZ at (512) 905-7822. During the call, which was conducted in Spanish, CRUZ advised it returns back well. FUENTEZ told him to check it, some "falls apart" but it was not "cut." CRUZ said there was a piece that he tried and looked like "cortina pelmazada." FUENTEZ said he "cooked" it and put in "twenty" to "twenty-one" and took out "thirty-two hard" and nothing was loose. CRUZ said he was going to put it in a "pot" because he always did. FUENTEZ told CRUZ to check it in front of the guy. CRUZ said he did not want "Homie" to call him back. FUENTEZ told CRUZ to put "twenty" in for himself and call back.

76.     On April 3, 2010, at approximately 15:17 hours, investigators observed an individual believed to be EDGARDO-GUILLEN, based on call number 1927 and accompanying surveillance, at 6503 Bluff Springs Road, Building 7, Austin, Texas. Your affiant was informed that EDGARDO-GUILLEN went inside the building, then exited the building and deposited

trash into a dumpster. Investigators observed two additional individuals inside the vehicle who had traveled with EDGARDO-GUILLEN. Your affiant was informed that one individual was MATUTE-GUILLEN, who was in the vehicle with EDGARDO-GUILLEN during this transaction. Detective Joe Lorrett retrieved the trash deposited by EDGARDO-GUILLEN, and discovered it contained suspected kilogram wrappers, latex gloves, and digital scales. Detective Otho DuBoise advised your affiant that the suspected kilogram cocaine wrapping tested presumptive positive for the presence of cocaine.

77.    Based on your affiant's training and experience in narcotics investigations and with this criminal organization, and the accompanying surveillance and discarded trash containing residue that tested positive for cocaine, your affiant believes FUENTEZ caused a quantity of cocaine to be delivered to CRUZ at 6503 Bluff Springs Road, Apartment 713, Austin, Texas. CRUZ then inspected the cocaine and his satisfaction was relayed to FUENTEZ. Furthermore, your affiant is aware that cooking cocaine is a commonly known term for mixing cocaine with baking soda and water, heating it to evaporate the water, with the result of crack cocaine. The added weight of the baking soda and water causes the crack cocaine to weigh more than the original substance, powdered cocaine. Your affiant is also aware that "hard" is a common slang term for crack cocaine, which is a harder substance than powdered cocaine.

78.    On April 4, 2010, at approximately 19:37 hours, call number 2032 on Target Telephone 4, FUENTEZ made an outgoing call to Jose GUADALUPE-VASQUEZ at (512) 634-6294, UFMI 143*132188*25. During the conversation, which was conducted in Spanish, FUENTEZ spoke to GUADALUPE-VASQUEZ and talked about a game. FUENTEZ then asked GUADLUPE-VASQUEZ if he went over there yet. GUADLUPE-VASQUEZ said he was at a

party, but he would ask about the stuff tomorrow.  FUENTEZ said he didn't know if that "thing" would come or if he would go over there tomorrow.

79.     Based on your affiant's training and experience in narcotics investigations and with this criminal organization, and physical surveillance, your affiant believes call 2032 was a coded conversation regarding cocaine trafficking between FUENTEZ and GUADALUPE-VASQUEZ.  GUADALUPE-VASQUEZ agreed to ask about the "stuff" and FUENTEZ advised he didn't know if that "thing" would come in.  Based on numerous intercepted calls and physical surveillance on April 3, 2010, and April 8, 2010, wherein both FUENTEZ and GUADALUPE-VASQUEZ are believed to have handled and distributed kilograms of cocaine, your affiant believes FUENTEZ and GUADALUPE-VASQUEZ agreed to check with their respective sources of cocaine supply to obtain a quantity of cocaine.

80.     On April 6, 2010, at approximately 11:02 hours, call number 611 on Target Telephone 3, FUENTEZ received an incoming call on Target Telephone 3 from EDGARDO-GUILLEN at (512) 844-7911.  During the call, which was conducted in Spanish,  EDGARDO-GUILLEN told FUENTEZ that "Negro" was going to give something to FUENTEZ.  FUENTEZ told  EDGARDO-GUILLEN to go and get it.  EDGARDO-GUILLEN said he would be there in "thirty-five" minutes.  FUENTEZ told  EDGARDO-GUILLEN to go get "it."  FUENTEZ then told  EDGARDO-GUILLEN to go where [unintelligible] used to live and he would see them there in "thirty" minutes.

81.     Based on your affiant's training and experience in narcotics investigations and with this criminal organization, and the accompanying surveillance, your affiant believes call number 611 was a coded conversation between FUENTEZ and EDGARDO-GUILLEN, wherein

EDGARDO-GUILLEN advised FUENTEZ that a cocaine customer, "Negro," wished to make a payment for his cocaine.  In order to insulate himself from direct contact with most of his customers and prevent exposure to possible law enforcement cooperators, FUENTEZ then told EDGARDO-GUILLEN to retrieve the money, "it."  They then stated when and where they expected to meet.

82.     On April 8, 2010, at approximately 13:14 hours, call number 2233 on Target Telephone 4, FUENTEZ received an incoming call from Jose GUADALUPE-VASQUEZ at (512) 634-6294.  During the conversation, which was conducted in Spanish, FUENTEZ spoke to GUADALUPE-VASQUEZ .  During this conversation, GUADALUPE-VASQUEZ asked FUENTEZ if he wanted cocaine and FUENTEZ said he did.  GUADLUPE-VASQUEZ told FUENTEZ there were six left and FUENTEZ asked for three.  GUADALUPE-VASQUEZ and FUENTEZ then agreed to meet later to make the exchange for suspected cocaine.

83.     On April 8, 2010, investigators observed GUADALUPE-VASQUEZ at 807 Turtle Creek, Austin, Texas.  Investigators observed GUADALUPE-VASQUEZ meet an unidentified male and place a heavy bag into his vehicle, a black Mitsubishi Eclipse, bearing Texas license plates 805VMW.  Investigators then observed the Mitsubishi depart.  Investigators believe GUADALUPE-VASQUEZ distributed cocaine.  Based on your affiant's training and experience in narcotics investigations and information relayed to your affiant from investigators who conducted surveillance on April 8, your affiant believes GUADALUPE-VASQUEZ distributed multiple kilograms of cocaine and conspired with FUENTEZ to supply FUENTEZ with three kilograms of cocaine.

84.     On April 20, 2010, at approximately 09:15 hours, call number 2669, FUENTEZ

34

made an outgoing call from Target Telephone 4 to GOROSIETA-CAMPUZANO at (512) 844-9419. During the call, which was conducted in Spanish, GOROSIETA-CAMPUZANO told FUENTEZ that "Chaparrito" [believed to be Luis OSORIO-DEPAZ based on surveillance accompanying intercepted calls] called to say he was over there with some money [cocaine], so GOROSIETA-CAMPUZANO would send FUENTEZ the "big money" [kilograms of cocaine] that he has with OSORIO-DEPAZ. FUENTEZ asked if something had come in that was not like that [higher quality cocaine]. GOROSIETA-CAMPUZANO replied, "not anymore" and it was like he had told FUENTEZ before and he should know how things are. GOROSIETA-CAMPUZANO told FUENTEZ he could wait on it for FUENTEZ and there wasn't any problem. He had a minor stumble and is limping, nevertheless, he can wait on FUENTEZ and then they can settle up. FUENTEZ asked GOROSIETA-CAMPUZANO if he had a chance to think about it, because FUENTEZ had to leave on Saturday. GOROSIETA-CAMPUZANO told FUENTEZ they would get together and talk later. FUENTEZ said he had the rest of what was pending with GOROSIETA-CAMPUZANO. GOROSIETA-CAMPUZANO told FUENTEZ that "Chaparrito" [OSORIO-DEPAZ] would take FUENTEZ the other stuff [cocaine]. FUENTEZ asked how much and GOROSIETA-CAMPUZANO said it was "3,000 pesos" [three thousand grams of cocaine, or three kilograms]. GOROSIETA-CAMPUZANO reminded FUENTEZ that he lent FUENTEZ "500" [five hundred grams of cocaine, or one half kilogram]. FUENTEZ acknowledged.

85.    Based on your affiant's training and experience in narcotics investigations and with this criminal organization, and the accompanying surveillance, your affiant believes call number 2669 was a coded conversation between FUENTEZ and GOROSIETA-CAMPUZANO,

wherein GOROSIETA-CAMPUZANO advised FUENTEZ he had sent OSORIO-DEPAZ to

FUENTEZ' location with cocaine "money" and would send FUENTEZ "big money" by

OSORIO-DEPAZ.  Based on intercepted communications and accompanying surveillance, your

affiant believes GOROSIETA-CAMPUZANO and FUENTEZ often refer to quantities of cocaine

in code using monetary amounts, such as "pesos" and "money."  Furthermore, investigators later

observed OSORIO-DEPAZ' meeting with suspected representatives of FUENTEZ.  Your affiant

believes a narcotics transaction occurred during this meet.

86.      On April 21, 2010, your affiant was informed that FUENTEZ was arrested by

APD investigators pursuant to a traffic stop.  FUENTEZ provided the a.k.a. Sergio ROMEL-

BELMONTES.  Later on April 21, 2010, your affiant was informed that approximately two

kilograms of suspected cocaine, approximately $15,000, and a Star 9mm pistol was seized at

FUENTEZ' residence, 4410 Norwood, Austin, Texas, pursuant to a state search warrant.

Investigators also located a Texas identification card with FUENTEZ' photograph in the name

Robert FRIAS, DOB November 26, 1980, a United States passport in the name Robert FRIAS,

DOB November 26, 1980, and a Continental Airlines itinerary for a flight from Houston, Texas,

to Tegucigalpa, Mexico, for Robert FRIAS on April 24, 2010.

87.      On April 21, 2010, your affiant was informed that investigators executed a search

warrant at 8303 Bluff Springs Road, Austin, Texas, the residence of known co-conspirators of

FUENTEZ.  During the search, investigators located a bedroom, with the personal belongings of

Emmanuel NAVA-BENITEZ, such as pay stubs bearing the name "Emmanuel Nava" and an

employee shirt from PeiWei bearing "Emmanuel."  Located in the closet, in a laundry basket, in a

safe, was approximately 1,100 grams of cocaine.  This substance tested presumptive positive for

the presence of cocaine. Based on physical surveillance, the residence at 8303 Bluff Springs was also believed to have been the residence of EDGARDO-GUILLEN and MATUTE-GUILLEN for the past week. Your affiant was informed that one kilogram press and jack was found in the laundry room, a bottle of Mannitol in the living room closet, and wrapping paper, commonly used to package kilograms of cocaine was also located in the kitchen trash recepticle.

88.    Based on your affiant's training and experience in narcotics investigations and with this criminal organization, your affiant believes NAVA-BENITEZ, EDGARDO-GUILLEN, and MATUTE-GUILLEN were storing, diluting, and repackaging cocaine at 8303 Bluff Springs Road, Austin, Texas, on behalf of FUENTEZ.

89.    Your affiant was informed that a state search warrant was executed at 12401 Copperfield Drive, Austin, Texas, on April 21, 2010. Investigators had been conducting physical surveillance throughout the day at this location and had observed OSORIO-DEPAZ arrive at this location and open the garage door. During the execution of this warrant, investigators seized one loaded 9mm Smith and Wesson handgun, approximately fourteen ounces of cocaine in the residence with OSORIO-DEPAZ. Based on your affiant's training and experience and knowledge of this investigation, your affiant believes this residence was used by GOROSIETA-CAMPUZANO as a narcotics storage location and his subordinate, OSORIO-DEPAZ frequently handled the distribution and reception of cocaine at this address.

90.    Based on the facts set forth in this affidavit, your affiant submits that there is probable cause to believe that Pedro FUENTEZ, Jose REYNALDO-CRUZ, Jose GUADALUPE-VASQUEZ, Oscar EDGARDO-GUILLEN, Emmanuel NAVA-BENITEZ, Irma MAJANO-ORELLANA, Walter ROSALES, Aurelio MATUTE-GUILLEN, Jose GOROSIETA-

CAMPUZANO, Luis OSORIO-DEPAZ, Celia Elizabeth AGUIRRE-FRIAS, and Javier CRUZ

did knowingly and intentionally conspire to distribute and possess with the intent to distribute a

mixture or substance containing a detectable amount of cocaine, a Schedule II Controlled

Substance. All in violation of Title 21, United States Code Section 846, Conspiracy to Distribute

and Possession with Intent to Distribute a Controlled Substance.

WHEREFORE, your affiant requests that an arrest warrant be issued for this individuals

for the above-described violations of law.


I, Jonathan M. Tapp, a Special Agent with the Federal Bureau of Investigation, being duly

sworn according to law, hereby states that the facts stated in the foregoing affidavit are true and

correct to the best of my knowledge, information and belief.


Dated this **23** day of **April**, 2010, at Austin, Texas.

JONATHAN M. TAPP
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


SUBSCRIBED and SWORN to before me this **23** day of April, 2010, at Austin, Texas.

UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF TEXAS